**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
**Sheldon L. Pollock**
**Alison R. Levine**
**Lee A. Greenwood**
**Christine D. Ely**
**Karolina Klyuchnikova**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street**
**Suite 20-100**
**New York, NY 10004**
**212-336-5472 (Klyuchnikova)**
**KlyuchnikovaKa@sec.gov**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>       **Plaintiff,**<br><br>  -against-<br><br>**OZY MEDIA, INC., CARLOS R. WATSON, JR., SAMIR RAO, and SUZEE HAN,**<br><br>       **Defendants.** | **COMPLAINT**<br><br>**23 Civ. 1424**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Ozy Media, Inc. ("Ozy"), Carlos R. Watson, Jr. ("Watson"), Samir Rao ("Rao"), and Suzee Han ("Han") (collectively, "Defendants") alleges as follows:

**SUMMARY**

1.  This case involves a brazen offering fraud in the securities of Ozy, a start-up media and entertainment company, perpetrated by its Chief Executive Office ("CEO") and founder, Watson, its former Chief Operating Officer ("COO"), Rao, and former Chief of Staff,

Han.  Watson and Rao, with the assistance of Han, repeatedly lied to investors about Ozy's financial condition, business relationships, and fundraising efforts in multiple fundraising rounds over a two-and-a-half year period, raising approximately $50 million from investors.

2.      From approximately January 1, 2019 to September 30, 2021 (the "Relevant Period"), Watson and Rao provided to prospective investors pitch decks and financial information that they knew vastly inflated Ozy's historical annual revenues – by at least 100% annually from 2018 through 2020.  Han knowingly assisted the fraud by helping to prepare and disseminate these false statements to investors.  Watson and Rao also repeatedly told prospective investors that other well-known and sophisticated investors would be investing large sums in Ozy or "leading" Ozy fundraising rounds – facts that Watson and Rao knew were false.  To date, investors have not received their money back.

3.      On February 2, 2021, as part of a scheme to obtain a $40 million investment from an investment bank (the "Prospective Investor"), Rao impersonated a YouTube executive on a conference call in an effort to embellish Ozy's business relationship with YouTube.  Though Watson later falsely attributed the incident to Rao suffering a mental health crisis, in truth and in fact, Watson and Rao had planned the elaborate scheme together and both were intimately involved in its execution and attempt to cover it up.  On September 26, 2021, *The New York Times* published an article reporting on Rao's impersonation.

## VIOLATIONS

4.      By virtue of the foregoing conduct and as alleged further herein, Defendants Ozy, Watson, and Rao violated Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1) and (3)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R.

§ 240.10b-5].

5.     By virtue of the foregoing conduct and as alleged further herein, Defendant Ozy also violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

6.     By virtue of the foregoing conduct and as alleged further herein, Defendants Watson and Rao aided and abetted Ozy's violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a))(2].

7.     By virtue of the foregoing conduct and as alleged further herein, Defendant Han aided and abetted Ozy, Watson, and Rao's violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8.     Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9.     The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

10.    The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Ozy and Watson to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and

Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Watson and Rao from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

12.    Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

13.    Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].  During the Relevant Period, certain acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District.  Among other things, Watson and Rao solicited at least one investor located within this District, who ultimately purchased Ozy securities and to whom Ozy sent an investor update letter in which Watson, Rao, and Han misrepresented Ozy's revenue.  Ozy also obtained a loan from a lender located within the District.

## DEFENDANTS

14.    **Ozy** is a Delaware corporation formed in 2012 with its principal place of business in Mountain View, California.  Ozy is a media and entertainment company that has produced daily news digest emails, television programming, podcasts, and live events.

15.   **Watson,** age 53, is a resident of California.  He was a registered representative associated with an investment bank from 2010 to 2012, during which time he held Series 24 and 79 securities licenses.  Watson is also a lawyer who was admitted to the bar in California in 1995.  He has never practiced law, however, and is not currently registered as a lawyer in California or in any other state.  Watson founded Ozy in 2012 and is its CEO.  Watson owned the majority of Ozy's common stock, preferred stock from Ozy's first four financing rounds, and common warrants.

16.   **Rao,** age 36, is a resident of New York.  He was a registered representative associated with an investment bank from 2008 to 2012, during which time he held Series 7 and 63 securities licenses.  Rao worked at the company from 2012 until October 2021 as the Director of Strategic Operations, Vice President of Operations, and ultimately Chief Operating Officer. Rao owned Ozy preferred stock and common warrants.

17.   **Han,** age 29, is a resident of Texas.  She worked as the Chief of Staff at Ozy from June 2019 to October 2021.

## FACTS

### I.   Background

#### A.   Ozy and the Defendants

18.   Watson and Rao met while working at an investment bank, where Watson was a managing director and Rao was an associate.

19.   After leaving the investment bank, Watson came up with the idea for Ozy.

20.   In 2012, Watson and Rao ran into each other in Mountain View, California, and Rao began working with Watson on developing the nascent idea for Ozy.

21.   On or about October 5, 2012, Watson incorporated Ozy.

22.   Before Han joined Ozy, Watson and Rao were the only Ozy employees

responsible for preparing materials for review by, and communicating with, prospective and existing investors.

23.     Rao was primarily responsible for preparing investor pitch decks and due diligence materials, organizing events, marketing, and attracting advertisers.

24.     After Han joined Ozy in 2019, she helped Rao with preparing investor pitch decks and due diligence materials, and organizing events, acting under his direction and supervision.

25.     Watson's sign-off on pitch decks and due diligence materials was typically required before the documents were provided to investors.

26.     Watson usually led investor presentations using the pitch decks, with Rao participating.

27.     Han also attended meetings with prospective and existing investors.

28.     During the Relevant Period, Ozy had eleven bank accounts, each of which Watson was a signatory on. Rao and Han were each signatories on at least one Ozy bank account.

**B.     Ozy's Initial Fundraising Efforts**

29.     Start-up companies like Ozy typically raise capital through "rounds" or "series" of external funding, through which investors provide investment funding to the company in exchange for equity at a specific valuation.

30.     The first round of financing is often referred to as the "seed" round.

31.     Between approximately late 2012 and 2013, Watson and Rao secured approximately $3 million in a seed round of financing led by a well-known philanthropic and impact investing firm ("Investor 1").

32.    A Series A round usually occurs when a start-up company has shown progress in building its business model, and can show a potential to generate revenue and grow.

33.    In approximately December 2013, Ozy raised over $6 million in a Series A round of financing led by another investment fund ("Investor 2").

34.    A Series B round usually occurs when a start-up company is past the initial start-up stage and has met certain milestones, such as generating revenue.

35.    In approximately October 2014, Ozy raised over $27 million in a Series B round of financing led by a foreign media company ("Investor 3").

36.    Initially, Ozy's business was limited to digital revenue, such as advertising sales connected to its digital news content.

37.    In 2016, Ozy expanded its business to television programming and live events, a change that required additional capital.

38.    In 2016, Ozy raised $9 million through a convertible note offering to its existing investors, including Investor 1 and Investor 2.  The convertible notes were scheduled to automatically convert to Ozy stock, at a discounted rate, during a future Series C fundraising round.

39.    In 2018, Investor 1 and Investor 2 purchased an additional $4 million in convertible notes from Ozy, again scheduled to automatically convert to Ozy stock, at a discounted rate, during a future Series C fundraising round.

40.    Despite this money raised from investors, however, Ozy did not have enough cash to satisfy its expenses.

41.    During at least 2018 and 2019, Ozy obtained several loans in an effort to pay its expenses.

42.     During the Relevant Period, Watson expected Rao and/or Han to provide him with regular (at times daily) cash position emails, which often included Ozy's loan debt balances and outgoing payments to loan companies.

43.     Watson and Rao, and Han after she joined Ozy, were in frequent email communication regarding tracking the status of investors and potential investors, as well as debt and revenue of Ozy.

## II.     Ozy, Watson, and Rao Make Repeated Material Misrepresentations to Investors During the Series C Raise

44.     A Series C financing round usually occurs when a company has shown financial success, and such financing round is usually intended to allow the company to grow.

45.     In early 2019, despite losing money and requiring loans to maintain cash in its bank accounts, Watson and Rao began fundraising for a Series C investment round.

### A.     Material Misrepresentations to Investor 5

46.     In approximately the spring of 2019, as part of these fundraising efforts, Watson and Rao engaged a registered representative located in Texas with clients in the Middle East ("Broker A") to introduce Ozy to potential Middle Eastern investors for the Series C raise.

47.     Watson told Broker A that Ozy was looking to raise $50 million in the Series C round, and that $35 million had already been secured.

48.     Specifically, Watson told Broker A that a well-known hedge fund manager ("Investor 4"), had already committed a $5 million investment to the round.

49.     Watson knew, or was reckless in not knowing, that his statement was false – Investor 4 had contributed just under $1 million to the round and had told Watson in an email that Investor 4 would not invest more.

50.     In May 2019, Watson traveled with Broker A to the Middle East for meetings

with potential investors, including an investment firm based in Abu Dhabi ("Investor 5").

51.    During the meeting with Investor 5, Watson presented a pitch deck – which Rao had drafted with Watson's input – containing multiple representations that Watson and Rao knew or recklessly disregarded were false or highly misleading.

52.    The deck stated that Ozy's 2018 revenue was $22 million when, in fact, it was about $10 million, and that certain well-known investors were "leading" the Series C round, when they were not.

53.    This fact was important to Investor 5's decision to invest because Investor 5 took comfort in the fact that reputable investors were leading the Series C round.

54.    Following their initial meeting, Ozy continued its misrepresentations to Broker A and Investor 5.  On June 21, 2019, in response to a request from Investor 5, Rao, emailed to Investor 5, copying Watson, an "Investor Summary" that misleadingly showed $5 million as a "Committed Amount" of "Series C Equity" from the "[Investor 4] Group," and over $2 million as a "Committed Amount" of "Series C Equity" from Investor 2.

55.    In fact, Investor 4 committed only under $1 million, and Investor 2 had not committed any amount for the Series C and ultimately did not invest in the round.

56.    Also, in a June 20, 2019 email, Rao, copying Watson, emailed Broker A that Investor 4 and a celebrity couple would be leading the Series C round.  Broker A then provided this information to Investor 5 on June 21, 2019.

57.    Watson and Rao knew, recklessly disregarded, that neither Investor 4 nor the celebrity couple were leading the Series C round.

58.    Investor 5 invested $3 million in Ozy's Series C round.

59.    Watson and Rao knew or recklessly disregarded that the representations alleged in

Section II.A above were false based on to their knowledge of Ozy's real financial condition, including as shown in emails between them tracking Ozy's true finances, including its revenue, debts, expenses, investors, and potential investors.

**B.     Material Misrepresentations to Investor 6**

60.     On May 14, 2019, Watson met with a foreign investment firm ("Investor 6"), to discuss Investor 6's potential investment in Ozy.

61.     Following the meeting, on June 4, 2019, Investor 6 requested a 2018 income statement.

62.     In response, that same day, Rao emailed Investor 6 a fabricated income statement reporting Ozy's 2018 revenue as $22 million – a nearly 120% inflation over the company's true revenue of just over $10 million – and copied Watson on the email.

63.     Watson also told Investor 6 that the Series C round would close imminently, in the second week of June 2019.  Watson implied a sense of exclusivity to the round, writing in a June 1, 2019 email to Investor 6, "I suspect that we are going to be pretty full and may have to make decisions."

64.     Because of the perceived urgency, on June 12, 2019, Investor 6 emailed Watson and Rao to ask whether certain foreign investors were going to be investing in the Series C round and explained that, given the abbreviated time for due diligence, Investor 6 wanted to consider its competitors' judgment, a common practice in Investor 6's home country.

65.     On June 14, 2019, Watson responded that Ozy was "going to accept an investment from at least one of the two [foreign] players and are undecided as to the other," and pressed Investor 6 to come to a decision:  "[We] need to get back to people with allocations in the next few days."

66.     Watson knew or recklessly disregarded that his statements were false.  While

Watson provided some initial due diligence materials to one of the "two [foreign] players," by the time of his June 14, 2019 email to Investor 6, that investment firm had ceased communicating with Watson and Ozy, and Watson had no basis for stating that Ozy was "going to accept an investment" from that firm.

67.     Moreover, Watson and Rao knew, or recklessly disregarded, that there was no real urgency with respect to the Series C closing process outside of Ozy's need for Investor 6's cash, as the round did not formally close until months later.

68.     Investor 6 invested nearly $2 million in Ozy by wiring its funds to Ozy on or about July 2, 2019.

69.     Watson and Rao knew or recklessly disregarded that the representations alleged in Section II.B above were false based on their knowledge of Ozy's real financial condition, including as shown in emails between them tracking Ozy's true finances, including its revenue, debts, expenses, investors, and potential investors.

III.    **Defendants Make Material Misrepresentations to Investors During the Series D Raise**

70.      A Series D round of financing usually occurs when a financially successful company is looking to raise capital for further expansion and growth.

71.     In the fall of 2020, Ozy began pursuing a Series D capital raise.

A.      **Continued Material Misrepresentations to Investor 5**

72.     On March 25, 2020, in an effort to convince Investor 5 to invest in the Series D round, Rao provided an income statement to Investor 5 showing Ozy's 2019 revenue as $33,748,000, when in fact, it was at most $13 million.

73.     Watson and Rao informed Broker A that a television star's company and a famous live entertainment company would be leading the round.

74. Rao also provided to Investor 5 an "Investor List" showing the television star's company and the star, as well as the famous live entertainment company, as "new" investors in Ozy.

75. The Series D closing documents that Rao provided to Investor 5 additionally included a "Schedule of Investors" that repeated this misrepresentation, falsely listing these alleged investors as contributing approximately $20 million and $10 million each, to the Series D round.

76. In reality, the famous television star, the television star's company, and the famous live entertainment company were not investors in Ozy at all.

77. Investor 5 invested almost $3 million more in Ozy's Series D round.

78. Watson and Rao knew or recklessly disregarded that the representations alleged in Section III.A above were false based on to their knowledge of Ozy's real financial condition, including as shown in emails between them tracking Ozy's true finances, including its revenue, debts, expenses, investors, and potential investors.

**B.    Misrepresentations to the Prospective Investor**

79. In November 2020, Watson pitched a potential investment in Ozy to employees in the Prospective Investor's asset management division.  Watson used a pitch deck that again inflated Ozy's historical revenue by over $11 million (120%) for 2018 and almost $20 million (150%) for 2019.

80. The deck also inflated Ozy's earnings before interest, taxes, depreciation, and amortization ("EBITDA") numbers by over 70% for 2018 and approximately 80% for 2019.

81. Although the Prospective Investor initially was not interested in the investment, its view of Ozy changed when, in early December 2020, Ozy provided additional falsified information showing, in particular, its robust TV licensing revenue projections.

82.     Specifically, during a December 4, 2020, conference call, Watson and Rao told the Prospective Investor personnel that YouTube had contracted for Ozy to deliver, in 2021, an agreed-upon number of episodes of a show called The Carlos Watson Show ("the Show"), an interview-format online show featuring Watson as the interviewer and various celebrity guests.

83.     On the same day, Rao provided to the Prospective Investor a "2021 Revenue Pipeline" spreadsheet claiming that Ozy had almost $20 million in "booked revenue" (excluding advertising revenue) for 2021 TV shows, of which $5,750,000 was supposedly the licensing revenue Ozy would receive from YouTube for the Show.

84.     In reality, Ozy had no licensing contract with, and received no revenue from, YouTube.  Indeed, Ozy paid YouTube to display the Show as an advertisement interspersed in other non-Ozy programming.  The only revenue the Show generated came from digital advertising fees that external advertisers paid Ozy to promote their products and services during presentations of the Show.

85.     The Prospective Investor considered the purported licensing revenue from YouTube to be important to its decision whether to invest in Ozy because television revenue was more attractive to the Prospective Investor than digital revenue.

86.     On January 5, 2021, in an email to Rao, the Prospective Investor requested an updated revenue pipeline.

87.     On January 7, 2021, Han, in an email to Watson and Rao, explained changes she made to the revenue pipeline that was to be provided to the Prospective Investor, writing: "I guided revenue up and expenses slightly higher from what we showed [the Prospective Investor] (also attached) to lower the ebit from 5.9M (proj[ected]) to 5.7M (actual)… I felt like the EBIT was getting way too high."

88.     In the same email to Watson and Rao, Han then listed falsified additions she made to the 2021 "booked revenue" from various sources to effect the revenue increase.

89.     Watson, Rao, and Han knew or recklessly disregarded that the representations they made to the Prospective Investor concerning Ozy's financial condition were false based on their knowledge of Ozy's real financial condition, including as shown in emails among them tracking Ozy's true finances, including its revenue, debts, expenses, investors, and potential investors.

90.     On January 19, 2021, the Prospective Investor and Ozy executed a term sheet describing a potential $35 million Series D investment by the Prospective Investor that would close within 45 days.

91.     The term sheet also contemplated a $10 million secondary investment by the Prospective Investor, assuming the full $50 million Series D round was sold to investors.

92.     The Prospective Investor continued with its diligence process, which, the team informed Ozy, would include accounting diligence.

93.     Concerned that the accounting diligence would reveal that Ozy's revenue numbers were fake, on or about December 27, 2020, Ozy hired an accounting firm ("the Accounting Firm") to provide Ozy with an analysis on the "quality of earnings" – an analysis of Ozy's reported earnings and predictions of its future potential earnings – before the diligence was scheduled to begin.

94.     On or about January 2, 2021, the Accounting Firm requested a copy of Ozy's general ledger ("Ledger") as part of its work.

95.    In an email on January 15, 2021, the Accounting Firm emphasized that it wanted "the general ledger to be extracted directly from the system with **no** modifications" (emphasis in original).

96.    However, over approximately the first three weeks of January 2021, Rao and Han, under Watson's supervision and direction, manipulated Ozy's true Ledger to make the Ledger revenue numbers match the fake revenue numbers that Ozy had previously provided to the Prospective Investor.

97.    Rao and Han, with input from Watson, altered the Ledger to double-count certain advertising revenue and wholly fabricated other revenue entries.

98.    As Rao and Han worked to complete the Ledger manipulation, Watson communicated with them frequently for updates on their progress, and pressed them to move more quickly.

99.    For example, on January 14, 2021, in regards to Rao and Han's continued work on altering the Ledger, Watson texted Rao, "be thorough," and "do not get tired."

100.    The Accounting Firm completed a cash balance reconciliation, but never actually provided a formal "quality of earnings" analysis to Ozy, because Ozy did not provide the firm with all the requested financial documentation and because, instead, by the end of January 2021, the Accounting Firm began assisting Ozy with responding to the Prospective Investor's initial accounting due diligence requests.

101.    According to the falsified 2021 "booked revenue" numbers, YouTube was Ozy's largest driver of TV licensing revenue.  In connection with ongoing due diligence, therefore, on or about January 13, 2021, the Prospective Investor asked to speak with a contact at YouTube to verify the information.

102.    Watson and Rao knew that no one at YouTube could back up their lies concerning the licensing revenue Ozy was supposedly receiving from YouTube.  To continue the ruse, on or about January 26, 2021, Watson and Rao agreed that Rao would pose as a real YouTube executive ("YouTube Executive A") to verify the misrepresentations on a call with the Prospective Investor.

103.    Rao created a fake email address for YouTube Executive A.  On or about January 28, 2021, Rao introduced the Prospective Investor's employees to the purported YouTube Executive A using the fake email address, and scheduled a virtual meeting via Zoom.

104.    The meeting was scheduled for February 2, 2021 (the "February 2 Meeting").

105.    No one from Ozy was to attend the February 2 Meeting.

106.    Ahead of the February 2 Meeting, Rao downloaded a voice alteration application for his mobile phone and practiced using it with Watson.

107.    The day of the February 2 Meeting, however, when Rao tried to use Zoom for the call, the voice alteration application failed.

108.    Consequently, in order to proceed with the planned deception, at the time the February 2 Meeting was scheduled to start, Rao – posing as YouTube Executive A from the fake email address – claimed to be having trouble with the platform and asked to move the meeting to a traditional conference phone call.

109.    When the call began, the Prospective Investor's employees noticed that the purported YouTube Executive A's voice sounded strange, and exchanged text messages expressing their suspicion that Watson was impersonating the real YouTube Executive A.

110.    Additionally, text messages between Watson and Rao during the February 2 Meeting confirm that Watson was physically present with Rao; indeed, Watson was coaching Rao throughout the call:

| Time | Sender | Recipient | Body of Text |
|------|--------|-----------|--------------|
| 11:19:35 AM[1] | Watson | Rao | "I am a big fan of Carlos, Samir and the show" |
| 11:21:06 AM | Watson | Rao | "Use the right pronouns" |
| 11:21:11 AM | Watson | Rao | "You are NOT OZY" |
| 11:23:42 AM | Watson | Rao | "GMA" <br> "Colbert" |
| 11:26:31 AM | Watson | Rao | "Stop using her [*Prospective Investor Executive's*] name" |

111.    After the call concluded, that same day, one of the Prospective Investor's employees contacted the real YouTube Executive A and confirmed that he did not know about or participate in the call, and that YouTube did not have a licensing contract with Ozy.

112.    That same day YouTube Executive A himself called Rao and Watson to question them about the incident.

113.    Realizing that their attempted deception had been discovered, Watson and Rao decided that they had to report the incident to Ozy's Board of Directors, and that Rao was to take the blame for the incident.

114.    On or around February 3, 2021, to cover up the story, Watson, with Rao's knowledge, falsely told Ozy's Board of Directors that Rao had suffered from a mental health condition that led to the impersonation.

115.    Watson did not inform the Board that he had been knowingly involved in the impersonation.

---

[1] All times listed in the chart are in Pacific Time.

116.    By February 3, 2021, the Prospective Investor had backed out of its potential investment.

117.    Due to the Prospective Investor backing out of its potential investment, Ozy's engagement of the Accounting Firm also concluded in approximately February 2021.

118.    Outside of Ozy's Board members, Watson informed no one, including Han, about the YouTube Executive impersonation, and Rao received no documented discipline from Ozy.

**C.      Misrepresentations to Investor 7**

119.    At the same time that Ozy was pursuing the Prospective Investor, it was also seeking other Series D investors, making similar misrepresentations to those investors about Ozy's financial condition, and using the possibility of the Prospective Investor's funding to persuade additional investors to participate in the capital raise.

120.    In particular, in the fall of 2020, Ozy began pitching a Series D investment to a California-based investment firm ("Investor 7").

121.    On November 6, 2020, Han, copying Watson and Rao, emailed Investor 7 a Series D investment deck.

122.    On an introductory call in December 2020, Watson and Rao presented to Investor 7 the Series D investment deck that, yet again, vastly overinflated Ozy's historical revenue numbers – by over $11 million (120%) for 2018 and almost $20 million (150%) for 2019.

123.    The deck also projected $45 million in revenue for 2020, when, in fact, Ozy would bring in only approximately $11.2 million that year – a gross overestimation to make in the final month of the year.

124.    Like the Prospective Investor, Investor 7 also understood that Ozy received licensing revenue directly from YouTube for the Show.

125.     It was important to Investor 7's decision to invest in the Series D financing that Ozy was merely posting the Show to YouTube as an advertisement, without a revenue agreement in place.

126.     In addition to fabricating Ozy's historical and projected revenue in communications with Investor 7, Ozy also falsely claimed that certain other investors were participating in the Series D round.

127.     During a December 2020 video conference call, Watson and Rao falsely told Investor 7 that one of three investment banks, the Prospective Investor, "Investment Bank 1" or "Investment Bank 2," would be anchoring the Series D round, and that each of the banks had executed a term sheet for the deal.

128.     On or about January 4, 2021, Watson repeated these misrepresentations on a phone call with Investor 7, stating that Ozy was still evaluating the term sheets from the three investment banks, and would likely accept Investment Bank 2 as the lead.

129.     Watson and Rao knew, or recklessly disregarded, that these statements were false or materially misleading.  While Ozy had received term sheets from Investment Bank 1 and Investment Bank 2, at the time of these misrepresentations, the term sheets concerned only debt, not equity, investments, and were contingent on a minimum amount of Series D equity raised. Neither Investment Bank 1 nor Investment Bank 2 would be anchoring the round, and neither debt investment ultimately materialized.

130.     Investor 7 placed importance on the representation that Ozy had obtained term sheets from investment banks because it demonstrated to Investor 7 that Ozy had passed their stringent due diligence processes.

131.     In addition, during the January 4, 2021 phone call, Watson also told Investor 7

that one of two well-known advertising agencies ("Advertising Agency 1" and "Advertising Agency 2," respectively) would be the "co-lead" with one of the investment banks.

132.   Watson knew, or was reckless in not knowing, that it was untrue that either Advertising Agency 1 or Advertising Agency 2 would co-lead this funding round.  Rather, Watson did not approach Advertising Agency 2 about the possibility of a Series D investment until January 20, 2021, days after his misrepresentation to Investor 7, and, by February 2, 2021, Advertising Agency 2 had already turned Ozy down.

133.   Furthermore, Advertising Agency 1 had informed Watson on December 16, 2020 that it was not interested in a Series D investment, well before Watson's January 4, 2021 call with Investor 7.

134.   On January 25, 2021, Watson reiterated to Investor 7, via text message, his misrepresentations about the Series D participation of Advertising Agency 1 and Advertising Agency 2.  Responding that same day to a text message from Investor 7 asking whether Advertising Agency 1 or Advertising Agency 2 would be investing in the Series D, Watson wrote, "Yes.  [Advertising Agency 1].  And perhaps [Advertising Agency 2] too."

135.   After the Prospective Investor backed out and the Series D did not close in February 2021, Watson falsely told Investor 7 that Ozy was delaying the closing because Ozy was outperforming its projections and the Series D valuation no longer made sense.

136.   Watson knew, or recklessly disregarded that in reality, that Ozy was not outperforming its already inflated projections, and the real reason the Series D could not close was due to the Prospective Investor pulling out of any investment after the fabricated call with YouTube Executive A.  Instead, Watson offered to reopen the Series C round to allow Investor 7 to still invest.

137.    Investor 7 purchased nearly $2 million worth of Series C shares.

138.    Investor 7 later invested an additional $250,000 in the Series D round, after Rao told Investor 7 that Investor 7's failure to continue to support Ozy would send a bad signal to other investors.

139.    Watson, Rao, and Han knew or recklessly disregarded that the representations alleged in Section III.C above were false based on their knowledge of Ozy's real financial situation, including as shown in emails between them tracking Ozy's true finances, including its revenue, debts, expenses, investors, and potential investors.

**D.    Defendants Continue to Make Material Misrepresentations to Current and Prospective Investors in 2021**

140.    Towards the end of 2020, a large public technology company ("Technology Company 1") contacted Watson to recruit him to lead its news service.

141.    In early 2021, Watson proposed to Technology Company 1 that it invest in Ozy's Series D round as part of a deal to hire him.

142.    Technology Company 1 subsequently engaged in further diligence concerning a possible strategic investment in Ozy.

143.    Technology Company 1 made clear to Watson that any investment would be contingent on Technology Company 1 hiring Watson and Watson departing Ozy.

144.    Technology Company 1 also told Watson that it would not act as the lead investor on the deal.

145.    Watson told Technology Company 1 that Investor 4, whom Technology Company 1 considered to be a well-known investor and business leader, would lead the round.

146.    Technology Company 1 further told Watson that Watson had to inform Ozy's Board, shareholders, and prospective Series D investors that, if Technology Company 1 were to

invest in Ozy, it would necessarily result in Watson, a key member of Ozy's executive staff, leaving Ozy.

147.    Despite the uncertainty of Technology Company 1's possible investment, Watson and Rao repeatedly and falsely told prospective investors that Technology Company 1 was "leading" the Series D round.

148.    As described further below, Ozy made this and other misrepresentations to a private investment firm that would become Ozy's largest Series D investor ("Investor 8").

149.    In March 2021, a famous athlete who eventually invested in the Series D round, introduced Watson to Investor 8's representative.

150.    On April 21, 2021, Han emailed the Series D deck to Investor 8, copying Watson and Rao.

151.    The deck made several material misrepresentations: (1) significantly inflating historical revenue for 2018 (by over $10 million), 2019 (by almost $20 million), and 2020 (by over $34 million), and falsely reporting positive EBITDA for 2020; (2) wrongly describing Technology Company 1 as the "lead investor" for the Series D round, a characterization Technology Company 1 had already rejected; and (3) calling Investor 4 an "anchor existing investor" for the round, when Investor 4 had not indicated that Investor 4 would invest in the round and, in fact, never did.

152.    On May 17, 2021, the day before the originally-scheduled Series D closing, Ozy sent Investor 8 deal documents falsely listing a Technology Company 1 affiliate as an investor when, in reality, this affiliate was not considering an investment in Ozy at the time.

153.    The participation of Technology Company 1, along with Investor 4 and Investor 1, led Investor 8 to believe it could rely on the due diligence of these purported investors, gave an "imprimatur" of quality to the deal, and was critical to Investor 8's decision to invest.

154.    Watson also did not tell Investor 8 that Technology Company 1's Series D investment was contingent upon Watson's exit from Ozy.

155.    On May 20, 2021, two representatives of Investor 8 ("Rep. 1" and "Rep. 2," respectively) exchanged instant messages revealing that Watson continued to overstate Technology Company 1's interest and conveying the importance of Technology Company 1's involvement to Investor 8's investment decision.

| Sender | Recipient | Body of Message |
|--------|-----------|-----------------|
| Rep. 1 | Rep. 2 | "Carlos [Watson] telling me that [Technology Company 1] is showing heightened interest in ozy" |
| Rep. 1 | Rep. 2 | "[Technology Company 1's CEO] just called carlos directly" |
| Rep. 2 | Rep. 1 | "Nice" |
| Rep. 1 | Rep. 2 | "Will call you as soon as he's done" |
| Rep. 2 | Rep. 1 | "Did [Technology Company 1] fund?" |
| Rep. 2 | Rep. 1 | "And did we get in there with them?" |
| Rep. 1 | Rep. 2 | "Asking him once he's done giving me an update" |
| Rep. 1 | Rep. 2 | "[Another company] showed him interest" |
| Rep. 2 | Rep. 1 | "Hopefully we can help him run process to sell the whole thing next year or go public" |

156.    Watson knew, or recklessly disregarded, that his statements to Rep. 1 were untrue. Technology Company 1 was not actually showing "heightened interest" in Ozy.  Rather, by this time, Technology Company 1 was skeptical about hiring Watson.  Indeed, Watson only spoke to Technology Company 1's CEO once, months earlier, and they did not discuss the company's possible accompanying investment in Ozy.

157.    At the end of May 2021, Watson falsely told Investor 8 that he had a new meeting scheduled with Technology Company 1's CEO, and that the company was so interested in Ozy that it was prepared to acquire the company for at least $600 million, with the potential for

incentives that would make the alleged proposed acquisition worth as much as $1 billion.  As part of this supposed acquisition, Watson claimed that Technology Company 1 would bring Ozy under its umbrella.

158.    Watson knew that his statements were false: Watson did not have a meeting scheduled with Technology Company 1's CEO at that time and they never discussed Technology Company 1 acquiring Ozy.

159.    Indeed, Technology Company 1 never considered buying Ozy at any price.

160.    However, persuaded by Watson's misrepresentations, Investor 8 encouraged Watson to turn down Technology Company 1's alleged offer, because Investor 8 believed that its investment could be even more lucrative post-close if acquisition talks continued.

161.    Investor 8 closed its $20 million investment in Ozy on May 27, 2021, becoming, unbeknownst to Investor 8, the largest and true lead investor in the Series D.

162.    After Ozy had obtained Investor 8's funding, on or about June 1, 2021, Watson told Technology Company 1 that he would no longer be pursuing the news position, and all talks between Technology Company 1 and Ozy ceased.

163.    Watson, Rao, and Han knew or recklessly disregarded that the representations alleged in Section III.D above were false based on their knowledge of Ozy's real financial situation, including as shown in emails between them tracking Ozy's true finances, including its revenue, debts, expenses, investors, and potential investors.

164.    In total, during the Relevant Period, Ozy raised approximately $50 million from investors through sales of its securities.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Sections 17(a)(1) and 17(a)(3)**
**(Ozy, Watson, and Rao)**

165.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 164.

166.    Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (i) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, and (ii) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

167.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Sections 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1) and (a)(3)].

**SECOND CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)(2)**
**(Ozy)**

168.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 164.

169.    Defendant, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

170.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)(2)].

### THIRD CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Ozy, Watson, and Rao)

171.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 164.

172.    Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

173.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Section 17(a)(2)
### (Watson, Rao, and Han)

174.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 164.

175.    As alleged above, Ozy violated Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

176.    Watson, Rao, and Han knowingly or recklessly provided substantial assistance to Ozy with respect to its violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

177.    By reason of the foregoing, Watson, Rao, and Han are liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting Ozy's violations of Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] and, unless enjoined, Watson, Rao, and Han will again aid and abet these violations.

## FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Sections 17(a)(1) and (3)
### (Han)

178.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 164.

179.    As alleged above, Ozy, Watson, and Rao violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. § 77q(a)(2) and (3)].

180.    Han knowingly or recklessly provided substantial assistance to Ozy, Watson, and Rao with respect to its violations of Securities Act Section 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1) and (3)].

181.    By reason of the foregoing, Han is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting Ozy, Watson, and Rao's violations of Securities Act Section 17(a)(1) and (3) [15 U.S.C. § 77q(a)(2) and (3)] and, unless enjoined, Han will again aid and abet these violations.

## SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5(b)
### (Han)

182.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 164.

183.    As alleged above, Ozy, Watson, and Rao violated Exchange Act Section 10(b)

[15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

184.    Han knowingly or recklessly provided substantial assistance to Ozy, Watson, and Rao with respect to its violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5b] thereunder.

185.    By reason of the foregoing, Han is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Ozy, Watson, and Rao's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder and, unless enjoined, Han will again aid and abet these violations.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

## I.

Permanently restraining and enjoining Defendants Ozy, Watson, Rao, and Han and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) and Exchange Act Section 10(b) [15 U.S.C. §§ 78j(b) and 78q(a)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)];

## II.

Ordering Defendants Ozy and Watson to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

### III.

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d)

[15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

### IV.

Permanently prohibiting Defendants Watson and Rao from serving as an officer or

director of any company that has a class of securities registered under Exchange Act Section 12

[15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C.

§ 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act

Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

### V.

Granting any other and further relief this Court may deem just and proper.

### JURY DEMAND

The Commission demands a trial by jury.

Dated: New York, New York
      February 23, 2023

ANTONIA M. APPS
REGIONAL DIRECTOR
Sheldon L. Pollock
Alison R. Levine
Lee A. Greenwood
Christine D. Ely
Karolina Klyuchnikova
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004
**212-336-5472 (Klyuchnikova)**
KlyuchnikovaKa@sec.gov